David B. Shanies
DAVID B. SHANIES LAW OFFICE
411 Lafayette Street, 6th Floor
New York, New York 10003
(212) 951-1710
david@shanieslaw.com

Ronald L. Kuby
LAW OFFICE OF RONALD L. KUBY
119 West 23rd Street, 9th Floor
New York, New York 10011
(212) 529-0223
ron@kubylaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

CARLOS DAVIS,

Plaintiff,

– against –

THE CITY OF NEW YORK, JEFFREY I.
GINSBERG, LONNIE W. OWENS, ROBERT
WILLIAMS, JOHN/JANE DOE NOS. 1 THROUGH
10, being unknown current or former employees of the
New York City Police Department, and JOHN/JANE
DOE NOS. 11 THROUGH 20, being unknown current
or former employees of the Kings County District
Attorney's Office,

Defendants.

---

JURY TRIAL DEMANDED

Index No.

**COMPLAINT**

---

Plaintiff Carlos Davis, by and through his attorneys, David B. Shanies and

Ronald L. Kuby, as and for his Complaint against the above-captioned Defendants,

alleges as follows:

**NATURE OF THE ACTION**

1.     Mr. Davis brings this action under 42 U.S.C. § 1983 and New York State

law, seeking to recover damages caused by the denial of his constitutional and legal

rights and his resulting wrongful conviction and loss of liberty.

2.     Mr. Davis' 1991 conviction was the product of perjured testimony,

fabricated evidence, and suppression of *Brady* information, as revealed through an

investigation by the Brooklyn District Attorney's Conviction Review Unit.

3.      The Conviction Review Unit independently opened an investigation into Mr. Davis' conviction in 2013 as part of its review of cases involving disgraced former NYPD detective Louis Scarcella, the arresting officer in Mr. Davis' case.

4.      At the conclusion of the Conviction Review Unit's investigation in 2015, the District Attorney joined in Mr. Davis' motion to vacate his conviction, proudly adding Mr. Davis to the District Attorney's list of "Conviction Review Unit Exonerations."

5.      The Brooklyn Supreme Court granted the motion, vacated Mr. Davis' conviction, and dismissed the indictment against him.

6.      Mr. Davis' wrongful conviction was caused by Defendants' unlawful and unconstitutional acts, omissions, policies, customs, and practices.

7.      Defendants' unconstitutional and unlawful conduct included manufacturing the false testimony of Kristie L. Hayes, the prosecution's key witness, whose testimony was fabricated in virtually every respect.

8.      Defendants suppressed *Brady* information,[1] including Ms. Hayes' true identity, facts contradicting her testimony, the improper methods used to induce her testimony, and documents and other information supporting the defense case.

9.      Defendants' suppression of *Brady* information, fabrication of evidence, and subornation of perjury were caused by express or *de facto* policies, customs, and practices of both the Brooklyn District Attorney's Office ("DA"), under former District

---

1.  Throughout this complaint, the term "*Brady*" information refers to information that must be disclosed to the defense under the Fifth and Fourteenth Amendments to the U.S. Constitution, including exculpatory, impeachment, and other favorable information, as explained in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), *United States v. Bagley*, 473 U.S. 667 (1995), and their progeny.

Attorney Charles J. Hynes.

10.     Mr. Davis, a married father of three children, a union worker, and an upstanding citizen who has had no interaction with the criminal justice system since his release nearly 20 years ago, is entitled to damages for the devastating harm caused by his wrongful conviction and deprivation of liberty.

## JURISDICTION AND VENUE

11.     This action arises under 42 U.S.C. §§ 1983 and 1988, and under the laws of the State of New York.

12.     Jurisdiction lies in this Court under its federal question, civil rights, and supplemental jurisdiction, 28 U.S.C. §§ 1331, 1343, and 1367.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's claims arose in the Eastern District of New York.

14.     Plaintiff Davis has complied with the requirements of New York General Municipal Law ("GML") § 50-i by serving a notice of claim on the City of New York Office of the Comptroller on June 19, 2015.

## PARTIES

15.     Plaintiff Carlos Davis is an individual residing in Queens, New York.

16.     Defendant City of New York, of which Kings County (Brooklyn) a subdivision, is a municipality and a political subdivision of the State of New York, existing by virtue of the laws of the State of New York.  Defendant City of New York is and was at all relevant times responsible for the policies, customs, and practices of the Brooklyn District Attorney's Office.

17.     Defendant Jeffrey I. Ginsberg is an individual residing in the State of New

York with a principal place of business in New York County.  Mr. Ginsberg was at all relevant times an employee of the Brooklyn District Attorney's Office, acting under color of State law pursuant to the statutes, ordinances, regulations, policies, customs, and practices of the State of New York, City of New York, and Kings County (Brooklyn).

18.     Defendant Lonnie W. Owens is an individual believed to be residing in Florida or New York, whose exact location is presently unknown to Mr. Davis.  Mr. Owens was at all relevant times a police officer and sergeant employed by the New York City Police Department, acting under color of State law pursuant to the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.

19.     Defendant Robert Williams is an individual whose current residence and place of business are unknown to Mr. Davis.  Mr. Williams was at all relevant times an agent of the Brooklyn District Attorney's Office; acting jointly and in concert with the District Attorney's Office; under the control of the District Attorney's Office; acting with the authority and significant encouragement and aid of the District Attorney's Office; and thereby acting under color of State law.

20.     Defendants John/Jane Doe Numbers 1 through 10 (the "NYPD John Does") are individuals, whose identities are currently unknown to Mr. Davis, who were at all relevant times police officers or detectives in the Brooklyn North Homicide Squad, 75th Precinct, or other division(s) of the New York City Police Department, acting under color of State law pursuant to the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.

21.     Defendants John/Jane Doe Numbers 11 through 20 (the "DA John Does")

are individuals, whose identities are currently unknown to Mr. Davis, who were at all relevant employees of the Brooklyn District Attorney's Office, acting under color of State law pursuant to the statutes, ordinances, regulations, policies, customs, and practices of the State of New York, City of New York, and Kings County (Brooklyn).

## FACTS

### The 1988 Shooting of Norris Williams

22.     On Friday night, September 16, 1988, Mr. Davis, an 18-year-old man about to become a father, was on the street outside his apartment on Cozine Avenue in East New York, Brooklyn.

23.     Around midnight, Mr. Davis was socializing with a group of people, including his friend Wayne Hemming, an acquaintance named Thomas Woodiard, and one or two others whose names Mr. Davis does not know.

24.     Shortly after midnight, a car pulled up near the group and four or more young men with guns quickly got out and advanced on Mr. Davis' group.

25.     The armed group in the car was looking for a man known by the name "Duke," with whom they had a dispute.

26.     The armed group included Mark Cross, Kirk Robinson, Cameron Chapman, and a man named Norris Williams, known by the name "Speedy." They began shooting almost immediately.

27.     When Mr. Davis saw men with guns, he ran away from them, heading northeast on Cozine Avenue, toward Schenck Avenue.

28.     Mr. Hemming, Mr. Woodiard, and the others present ran in various directions or hid behind cars parked on Cozine Avenue.

29.     Mr. Davis continued running until he made it back safely to his family's apartment, where he stayed until detective Scarcella came to arrest him later that morning.

30.     Mr. Williams was shot and killed during the uproar, by one of the members of his own group using a .38 caliber gun of unknown make and model.

31.     One or more of Mr. Williams' associates tried to render assistance to him, which was futile given the severity of his injury.  Everyone in Mr. Williams' group, however, fled the scene before the police arrived.

32.     When police officers arrived at the scene, they found Mr. Williams' body laying on the ground, with a jacket belonging to one of the members of Mr. Williams' group placed under his head.

33.     Police canvassed the area and conducted a search.  NYPD personnel present at the scene included detective Scarcella, Police Officer Dennis Lane, and Defendant Lonnie W. Owens, a sergeant in the 75th Precinct and Mr. Williams' stepfather.

34.     Police recovered spent shell casings of multiple calibers, including .38 caliber, from the area where Mr. Williams' body was found.

35.     Police recovered numerous .38 caliber live rounds and numerous .38 caliber spent shell casings in the pocket of the jacket that had been placed under Mr. Williams' head.

36.     Police recovered numerous 9mm live rounds from Mr. Williams' pants pocket.

37.     The clothing, bullets, and discharged shell casings were the only recorded

physical evidence recovered from the crime scene.

38.     The following week, during the autopsy, the Medical Examiner removed a .38 caliber deformed lead bullet from Mr. Williams' body.

**Mr. Davis' Arrest**

39.     After the shooting, in the early morning hours of September 17, 1988, Mr. Cross and Mr. Chapman went to the apartment of Janet Williams, Mr. Williams' mother and Sergeant Owens' wife.

40.     Later that morning, detective Scarcella and Sergeant Owens arrived at the apartment and spoke to Ms. Williams, Mr. Cross, and Mr. Chapman.

41.     Mr. Cross and Mr. Chapman told detective Scarcella that "Carlos" (referring to Mr. Davis) shot and killed Mr. Williams.

42.     In fact, it was either Mr. Cross, Mr. Chapman, or another member of their group who shot and killed Mr. Williams.

43.     Neither detective Scarcella nor Sergeant Owens investigated the possibility that Mr. Cross, Mr. Chapman, or any other member of Mr. Williams' group shot Mr. Williams.

44.     A few hours later, detective Scarcella and his partner, Detective William Morris, arrived at Mr. Davis' family's apartment and arrested Mr. Davis.

45.     Detective Scarcella brought Mr. Davis back to the 75th Precinct station house, where Sergeant Owens and Detective William Grub of the 75th Precinct were waiting for them.

46.     Mr. Davis was placed in a lineup and then processed for arrest.

**Mr. Davis' Prosecution and Trial**

47.     On September 17, 1988, Mr. Davis was charged by felony complaint with murder in the second degree.

48.     In October 1988, Mr. Davis was indicted for murder in the second degree and criminal possession of a weapon in the second and third degrees.

49.     After the indictment, Mr. Davis' defense attorney filed pre-trial motions seeking, among other things, all witness statements, *Brady* information, and scientific evidence.

50.     On August 15, 1989, Assistant District Attorney Kenneth Rigby applied for and obtained material witness orders to produce Mark Cross and Kirk Robinson, both then state prisoners for unrelated crimes, to appear in court for pre-trial hearings in Mr. Davis' case.  Both men refused to testify.

51.     Mr. Davis' trial took place from January 30 through February 8, 1991. The prosecuting attorney was Mr. Ginsberg and Mr. Davis' defense attorney was Stuart Shaw.

52.     The prosecution's witnesses were detective Scarcella, Officer Lane, Mr. Robinson, Mr. Cross, Deputy Medical Examiner John Pearl, and Ms. Hayes.

**The Prosecution's Eyewitness Problems**

53.     With no weapon, forensic evidence, or any statement by Mr. Davis linking him to the crimes charged, the prosecution's case rested entirely on eyewitness testimony.

54.     The prosecution intended to call three eyewitnesses: Mr. Cross, Mr. Robinson, and Mr. Chapman.

55.     All three of those witnesses, however, had recanted their previous

statements implicating Mr. Davis in Mr. Williams' shooting, and refused to testify.

56.     Desperate to salvage his case, Mr. Ginsberg sought assistance from Kenneth M. Taub, his supervisor in the District Attorney's Office; Sergeant Owens, Mr. Williams' stepfather and an officer in the 75th Precinct; and Robert Williams, Mr. Williams' brother.

57.     Mr. Taub and Mr. Ginsberg met with Mr. Cross and Mr. Robinson, both of whom were incarcerated, and attempted to coerce their cooperation.

58.     Mr. Ginsberg threatened both men that he could make their time in prison more difficult if they did not cooperate, and made improper promises to both men that he could make their time in prison easier if they did cooperate.

59.     Mr. Ginsberg threatened both men that they could be prosecuted for Mr. Williams' murder, emphasizing that the defense argued that Mr. Williams was shot by someone in his own group.

60.     Mr. Ginsberg threatened both men with prosecution for contempt and/or perjury if they did not "stick to their story" and testify against Mr. Davis.

61.     Mr. Ginsberg also spoke with Sergeant Owens, Robert Williams, and Janet Williams (Mr. Williams' mother) to coordinate their efforts to locate witnesses and squeeze them to testify.

62.     Mr. Ginsberg directed Sergeant Owens and Robert Williams to attempt to locate Mr. Chapman and pressure him to testify for the prosecution, by any means necessary, including the threat of prosecution for perjury, contempt, and/or the murder of Mr. Williams.

63.     Meanwhile, the prosecution called both Mr. Robinson and Mr. Cross as

9

witnesses.

64.     Mr. Robinson took the witness stand and testified that he had no knowledge whatsoever of Mr. Williams' shooting.

65.     Mr. Ginsberg threatened Mr. Robinson with prosecution for contempt and/or perjury.

66.     Nevertheless, Mr. Robinson maintained that he had no knowledge of the shooting and did not even recall his whereabouts on the night of the shooting.

67.     Mr. Ginsberg and Mr. Taub asked the court for a recess and to arrange a "courtroom visit supervised by court officers" between Mr. Robinson and Ms. Williams. The court granted the prosecutors' request.

68.     Mr. Ginsberg and Mr. Taub directed Ms. Williams to speak with Mr. Robinson and attempt to convince him to testify against Mr. Davis.  Ms. Williams complied.

69.     After the "courtroom visit," the prosecution told the court that Mr. Robinson was then willing to testify.

70.     When he retook the witness stand, however, Mr. Robinson told the court that Mr. Ginsberg had threatened him and made improper promises to him, and refused to testify.

71.     Mr. Robinson was excused and Mr. Cross took the witness stand, accompanied by his attorney, Arthur H. Miller.

72.     Mr. Cross testified that, on the advice of his attorney, he refused to answer any questions on the ground that he might incriminate himself.

73.     Mr. Ginsberg conferred limited immunity on Mr. Cross, and the court

instructed Mr. Cross that he no longer had a Fifth Amendment right to refuse to testify.

74.     Mr. Ginsberg asked Mr. Cross whether he saw Mr. Davis holding a handgun on the night of the shooting,

75.     Mr. Cross testified that he did not see Mr. Davis do anything at all.

76.     Mr. Cross then refused to answer any more questions.  When the court ordered Mr. Cross to answer the questions, he testified that he had no knowledge of the events on the night of the shooting.

77.     Mr. Cross was excused and court adjourned for the day.

78.     The next morning, the prosecution told the court that it had no further witnesses, and asked for an adjournment of two days to attempt to locate Mr. Chapman.

79.     The court said, "No way."

80.     Mr. Ginsberg then proposed to make "one last attempt" to find a witness "using the 75th Precinct detectives."  Mr. Ginsberg told the court that if he did not locate a witness, the prosecution would dismiss the charges against Mr. Davis.

81.     The court gave the prosecution one day to find Mr. Chapman, adjourning the case to the next morning.

**Kristie Hayes' Perjured Testimony**

82.     Mr. Ginsberg contacted Sergeant Owens, Robert Williams, and one or more of the John/Jane Doe defendants and directed them to locate a witness to testify against Mr. Davis.

83.     Robert Williams contacted Ms. Hayes and urged her to testify for the prosecution.  Ms. Hayes agreed to meet at Robert Williams' home, where he lived with his mother and Sergeant Owens.

84.     Mr. Ginsberg, Sergeant Owens, Robert Williams, and one or more of the John/Jane Doe defendants met with Ms. Hayes at the Williams family's home.

85.     The defendants, knowing that Ms. Hayes did not witness the shooting, fed her a false narrative and coached her on how to testify against Mr. Davis.

86.     The defendants knew that the testimony they instructed Ms. Hayes to give was false.

87.     The defendants made express and implicit threats to Ms. Hayes to induce her to testify, including by telling Ms. Hayes, in words or substance, that she risked arrest and criminal prosecution if she did not testify as the defendants instructed.

88.     The defendants made explicit and implicit promises and assurances to Ms. Hayes to induce her to testify, including promises to help her family and protect her from uncharged criminal conduct for which she was in jeopardy at the time.

89.     In the alternative, Sergeant Owens, Mr. Williams, and one or more of the John/Jane Doe defendants knew the foregoing information and concealed it from the prosecution, with the intent that it be kept from Mr. Davis and the defense.

90.     The next morning, Ms. Hayes took the witness stand at Mr. Davis' trial.

91.     Ms. Hayes falsely identified herself as "Christina Smith" and proceeded to testify falsely about who she was, how she came to testify that day, and what she witnessed on the night of the shooting.

92.     The prosecution knew Ms. Hayes' testimony was false in all material respects and that her statements the night before contradicted her testimony.

93.     Ms. Hayes falsely testified that she knew Mr. Davis and saw him fire a gun on September 17, 1988, on Cozine Avenue near Van Siclen Avenue.

94.     After Ms. Hayes finished testifying, the prosecution rested its case.

95.     Ms. Hayes' false testimony was the only evidence linking Mr. Davis to the crimes charged in the indictment.  Without that testimony, Mr. Davis could not have been convicted.  Prior to Ms. Hayes' testimony, in fact, the prosecution pledged to dismiss all charges if it were unable to find an additional witness.

**End of Trial and Mr. Davis' Conviction**

96.     The defense presented its case, including the testimony of Mr. Hemming and defense investigator Ralph Addonizio.

97.     Mr. Hemming testified that he was with Mr. Davis on the night of the shooting and witnessed Mr. Williams, Mr. Cross, and Mr. Robinson firing guns, while he, Mr. Davis, and other people on the street either took cover or ran away from the gunfire.

98.     Mr. Addonizio testified about certain measurements he took and observations he made at the crime scene, in an effort to discredit Ms. Hayes' testimony.

99.     In summation, both sides focused on the issue of witness credibility, pitting Mr. Hemming's testimony against that of Ms. Hayes.

100.    The defense attorney argued that Mr. Williams was shot by one of the members of his own group, not Mr. Davis, and that Mr. Hemming's testimony was more credible that Ms. Hayes'.

101.    Mr. Ginsberg, the prosecutor, urged the jury to believe Ms. Hayes (referring to her by her fake name, "Ms. Smith") and not Mr. Hemming.

102.    Mr. Ginsberg told the jury that Ms. Hayes "came forward to testify," a statement he knew was false.

103.    At no time during the trial did the prosecution disclose to the defense: (a)

that Ms. Hayes lied about her identity, how she came to testify, and what she saw on the night of the shooting; (b) that the prosecution's file contained a document ("Receipt for Autopsy Evidence," dated September 22, 1988) indicating that Mr. Williams was shot and killed by a .38 caliber weapon, matching the ammunition found in the jacket that was placed under Mr. Williams' head immediately after the shooting; (c) that Ms. Hayes (a/k/a "Ms. Smith") was in jeopardy for uncharged criminal conduct at the time she testified; or (d) any other *Brady* information concerning Ms. Hayes.

104.    The court dismissed the charge of criminal possession of a weapon in the third degree, charging the jury on two counts of murder in the second degree and one count of criminal possession of a weapon in the second degree (possession with intent to use unlawfully on another).

105.    On February 8, 1991, the jury returned a verdict of not guilty by reason of justification to the charge of murder in the second degree and a verdict of guilty to the charge of criminal possession of a weapon in the second degree.

106.    On March 5, 1991, the court sentenced Mr. Davis to 7 and ½ to 15 years' imprisonment, plus five years' post-release supervision.

107.    Mr. Davis remained imprisoned through March 13, 1997, after which he remained on parole and/or post-release supervision for a number of years.

**Mr. Davis' Exoneration**

108.    Since his parole in 1997, Mr. Davis has lived in New York City, working as a union laborer.

109.    Mr. Davis married, had two more children with his wife, and has maintained a strong relationship with all three of his children.

110.    Mr. Davis has been an active volunteer and mentor in his community for many years.

111.    Mr. Davis has never since been arrested and had no contact with the criminal justice system until 2015, when he was contacted by the District Attorney's Office and told that he had been exonerated through an investigation by the Conviction Review Unit.

112.    In 2013, the Conviction Review Unit (then called the "Conviction Integrity Unit") opened a reinvestigation into Mr. Davis' case.

113.    Mr. Davis' was one of numerous cases reopened because of their connection to former detective Scarcella.

114.    The Conviction Review Unit reinvestigated Mr. Davis' case between 2013 and 2015.

115.    In that process, the Conviction Review Unit learned that Ms. Hayes, the prosecution's key witness, lied in virtually every aspect of her testimony, and in all likelihood was not even present at the crime scene on the night of the shooting.

116.    In 2014 and 2015, members of the District Attorney's Office contacted Mr. Davis.  They informed Mr. Davis of the results of the Conviction Review Unit's reinvestigation and advised him that the District Attorney's Office would consent to vacate his conviction.

117.    On April 2, 2015, Mr. Davis moved to vacate his conviction in Brooklyn Supreme Court.  The District Attorney's Office joined in the motion and further moved to dismiss the indictment against Mr. Davis.  The court granted both motions, and the case was dismissed and sealed.

**Damages**

118.    As a proximate result of the defendants' wrongful conduct and Mr. Davis'

resulting wrongful conviction and loss of liberty, Mr. Davis has suffered, currently

suffers, and will continue to suffer from pecuniary and non-pecuniary injuries, including

past, present, and future physical, mental, emotional, and psychological damages; past,

present, and future loss of income and earnings; past, present, and future reputational

harm; and past, present, and future legal and medical fees and costs.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

Denial of Due Process and a Fair Trial (U.S. Constitution Amendments IV, V, VI, XIV)

*Against Defendants Owens, Williams, and John/Jane Does 1-20*

119.    Mr. Davis repeats and realleges the foregoing paragraphs and incorporates

them by reference as if fully set forth herein.

120.    Defendants Owens, Williams, and John/Jane Does 1-20 knowingly and

intentionally manufactured, or caused the manufacturing of, false evidence that they

knew would and intended to be used against Mr. Davis at his trial, namely, Ms. Hayes'

false testimony.

121.    Defendants knew and intended that the false evidence would deprive Mr.

Davis of a fair trial and result in his wrongful conviction and incarceration.

122.    Defendants, with actual malice, continued or caused the continuation of

criminal proceedings against Mr. Davis for which they knew, or should have known,

there was no probable cause, and for which in fact there was no probable cause, and

thereby caused Mr. Davis to be deprived of his liberty.

123.    Defendants knew and intended that *Brady* information – including Ms. Hayes' true identity, facts contradicting her testimony, the improper methods used to induce her testimony, and documents and other information supporting the defense case – would be concealed from Mr. Davis and his attorney.

124.    Defendants caused said *Brady* information to be concealed from Mr. Davis and his attorney by failing to disclose it, conspiring to suppress it, and inducing Ms. Hayes and others not to disclose it.

125.    The criminal proceedings terminated in Mr. Davis' favor.

126.    Defendants' conduct, committed in concert with one another and/or others, deprived Mr. Davis of his rights under the United States Constitution: (a) not to be prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading "evidence," including the testimony of Ms. Hayes who was improperly influenced, coerced, and/or manipulated to give false testimony, and whose testimony defendants knew was false, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; (b) not to be deprived of his liberty absent probable cause, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and (c) to timely disclosure of material evidence favorable to the defense under *Brady*, as defined in note 1, *supra*, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

127.    Defendants' acts and omissions proximately caused the continuation of Mr. Davis' criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

128.    Defendants committed the foregoing violations, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Mr. Davis' constitutional rights.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

Denial of Due Process and a Fair Trial (U.S. Constitution Amendments V, VI, XIV)

*Against Defendant Ginsberg*

129.    Mr. Davis repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

130.    Mr. Ginsberg, acting in an investigative capacity, knowingly and intentionally manufactured, or caused the manufacturing of, false evidence that he knew would and intended to be used against Mr. Davis at his trial, namely, Ms. Hayes' false testimony.

131.    Mr. Ginsberg knew and intended that the false evidence would deprive Mr. Davis of a fair trial and result in his wrongful conviction and incarceration.

132.    Mr. Ginsberg, with actual malice, caused the continuation of criminal proceedings against Mr. Davis for which he knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Mr. Davis to be deprived of his liberty, by manufacturing false evidence.

133.    Mr. Ginsberg's conduct, committed in concert with his codefendants in this action and/or others, deprived Mr. Davis of his rights under the United States Constitution: (a) not to be prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading "evidence," including the testimony of Ms. Hayes

who was improperly influenced, coerced, and/or manipulated to give false testimony, and whose testimony defendants knew was false, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and (b) not to be deprived of his liberty absent probable cause, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

134.    Mr. Ginsberg's acts and omissions proximately caused the continuation of Mr. Davis' criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

135.    Mr. Ginsberg committed the foregoing violations, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Mr. Davis' constitutional rights.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978)

*Against Defendant City of New York*

136.    Mr. Davis repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

137.    At the time of Mr. Davis' prosecution, and continuing through the time Mr. Davis completed his sentence and was released from custody, former District Attorney Charles J. Hynes, as the manager, chief administrator and policy-maker of the Brooklyn District Attorney's Office, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional

rights of individuals who were investigated and criminally prosecuted in Brooklyn.

138.    Among other things, Assistant District Attorneys and District Attorney's Office investigators engaged in a custom and practice of: (a) manufacturing false evidence and testimony through improper coercion of witnesses; (b) knowingly presenting false testimony and arguments at criminal proceedings; (c) suppressing *Brady* information; and (d) covering up these unlawful practices.

139.    These policies, customs, and practices began with Mr. Hynes' induction as District Attorney in 1990 and persisted through at least 2010.

140.    Mr. Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the District Attorney's Office, particularly in serious cases where arrest and conviction was most desired by the Office.

141.    These policies, customs, and practices proximately caused the violations of Mr. Davis' constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

142.    Mr. Hynes' policy was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information.  Mr. Hynes' deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Mr. Davis' case.

143.    Under Mr. Hynes' office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to refrain from making any

record of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required regardless of whether the information is recorded in written form.

144.    Mr. Hynes' training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

145.    Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as unreliable, and encouraged to cover up *Brady* information kept hidden by other members of the District Attorney's Office.

146.    Prosecutors were permitted and encouraged not to comply with the Office's ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and/or through FOIL requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the District Attorney's Office and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

147.    Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), Mr. Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements.

148.    Mr. Hynes had no employee handbook, manual, or other document setting

forth any disciplinary process or potential penalties for *Brady* or other constitutional

violations by prosecutors or investigators.

149.    Despite dozens of court decisions, many of which are listed in Exhibit A,

finding that prosecutors had wrongfully failed to disclose information as required under

*Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled

courts, juries, defendants, and/or defense attorneys, none of the prosecutors involved was

disciplined.

150.    Under Mr. Hynes' policies, customs, and practices, no prosecutor was

fired, suspended, fined, or demoted for such misconduct.

151.    Even where misconduct was found to have occurred, no record of the

misconduct was placed in the personnel file of any prosecutor or investigator responsible.

152.    No prosecutor was ever reported to outside disciplinary bodies for such

misconduct, even when the misconduct violated applicable ethical rules.

153.    To the contrary, in opposing defendants' efforts to overturn their

convictions in such cases, Mr. Hynes stubbornly defended the propriety of his

employees' behavior, thereby ratifying and signaling his tolerance of it.  Personnel found

to be involved in such misconduct continued to receive raises, bonuses, and promotions.

154.    During depositions in *Zahrey v. City of New York*, et al., 98 Civ. 4546

(DLP) (S.D.N.Y), Mr. Hynes' former Chief of Investigations, Dennis Hawkins, and

former Counsel to the District Attorney, Dino Amoroso, acknowledged that there was no

formal disciplinary procedure or policy for prosecutorial or police misconduct committed

by District Attorney's Office employees, and they were unaware of any prosecutor ever

being disciplined during Mr. Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution. In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

155.    Mr. Hynes' office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

156.    Mr. Hynes' office provided no training on how to question or evaluate informant or accomplice witnesses.

157.    Mr. Hawkins testified in the *Zahrey* case that, despite having virtually daily contact with Mr. Hynes over many years, he never heard Mr. Hynes discuss the training of prosecutors in such areas.

158.    Even after judgments were entered against District Attorney's Office-affiliated individual defendants in the *Zahrey* case and other, similar civil rights lawsuits, Mr. Hynes' office conducted no investigation and imposed no discipline on any of the employees involved.

159.    A number of cases handled by Mr. Hynes' office evidence the above policies and practices of encouraging and tolerating misconduct by District Attorney's Office staff.

160.    Early in his tenure, Mr. Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 152 (1992), a case where the District Attorney's Office secured a murder conviction by arresting and threating a 17 year-old witness with prosecution and imprisonment until she agreed to testify against the defendant. In reversing that conviction, the court condemned the "egregious" behavior of

the Brooklyn District Attorney's Office in "'legally' coerc[ing] testimony." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). The Court wrote that such conduct prejudiced defendants, victimized witnesses, and undermined the integrity of the criminal justice process.

161.    No training or disciplinary action was taken to remedy the misconduct exposed in the *Russ* case.

162.    Other examples of the District Attorney's Office's practice of improperly coercing false testimony and Mr. Hynes' endorsement of that practice include the cases of Jabbar Collins (1995) and Ruddy Quezada (1993), in which the prosecution's key witnesses were secretly arrested and threatened with imprisonment (and, in Mr. Collins' case, physical violence) if they did not testify for the prosecution.

163.    Mr. Hynes vigorously defended both cases, including after both the suppression of *Brady* information and improper coercion of witnesses were brought to light, and approved of the conduct of his prosecutors and investigators in those cases.

164.    In 1994, Mr. Hynes ratified the misconduct of his Office in the Sarni Leka murder prosecution. Shortly after the 1990 conviction, Mr. Leka moved to vacate his conviction because the prosecution had actively suppressed a variety of *Brady* information.  Not only did Mr. Hynes's office vigorously oppose the defendant's motion and appeal, but Mr. Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process right as a defendant were amply and ably protected."  In 2001, however, the U.S. Court of Appeals for the Second Circuit vacated Mr. Leka's conviction, finding that the Brooklyn District Attorney's Office had actively "suppressed" exculpatory evidence, decrying one of its arguments as

"ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identifications witnesses having recanted their testimony, the Brooklyn District Attorney's Office was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

165. No training or disciplinary action was taken to remedy the misconduct exposed in the *Leka* case.

166. The violations of Mr. Davis' constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Davis, subject to investigation and prosecution by the Brooklyn District Attorney's Office, including:

a. The institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

    i.    the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

    ii.    the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

    iii.    the continuing duty to obtain, preserve, and timely disclose, during

criminal investigations and prosecutions, all material evidence or

information favorable to a person suspected, accused, or convicted of

criminal conduct, including exculpatory evidence as well as evidence

impeaching or undermining prosecution witnesses; and

b. the failure to adequately instruct, train, supervise, and discipline employees

with respect to such matters.

167.    The foregoing express or *de facto* policies, practices, and customs

(including the failure to properly instruct, train, supervise, and/or discipline employees

with regard thereto) were implemented or tolerated by policymaking officials for the

Defendant City, including, but not limited to, the then-Brooklyn District Attorney and his

delegates, who knew to a moral certainty that such policies, procedures, regulations,

practices and customs implicated issues that regularly arise in the investigation and

prosecution of criminal cases; that such issues either present employees with difficult

choices of the sort that instruction, training and/or supervision will make less difficult or

that the need for further instruction, training, supervision and/or discipline was

demonstrated by a history of employees mishandling such situations as well as the

incentives that employees have to make the wrong choice; and that the wrong choice by

municipal employees concerning such issues will frequently cause the deprivation of the

constitutional rights of an accused and cause him constitutional injury.

168.    The aforementioned policymaking officials had the knowledge alleged in

the preceding paragraph, based upon, among other circumstances: as noted above,

numerous credible allegations, many substantiated by judicial decisions, that prosecutors

and investigators wrongfully withheld, lost, or destroyed evidence favorable to the

defense that the prosecution had been required to timely disclose to the defense under *Brady*, had presented or failed to correct false or misleading testimony and argument, and/or had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses; numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the Brady rule and the failures of New York City or Brooklyn prosecutors with that rule; judicial decisions putting the Brooklyn District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding their *Brady* and related due process obligations including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g.*, *Walker v. City of New York*, 974 F. 2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001), *Leka v. City of New York*, 04 CV 8784 (DAB) (S.D.N.Y.), and *Zahrey v. City of New York*, 98 Civ. 4546 (DCP) (S.D.N.Y.); the need to train, supervise and discipline prosecutors and investigators in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

169.    Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City, including the Brooklyn District Attorney's Office, perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs; did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or

other published practices,  policies or procedures for investigating and disciplining prosecutor s who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practice and/or customs, described above, with deliberate indifference to the effect this would have upon the constitutional rights of individuals and citizens of the City and State of New York.

170.   The aforesaid policies, practices and customs of Defendant City of New York were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Davis' rights under the Constitution and laws of the United States, and in causing his wrongful conviction and resulting damages.

171.   Under the principles of municipal liability for federal civil rights violations, the Brooklyn District Attorney (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence or Brady material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

172.   Mr. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel

hiring, training, supervision and discipline, with respect to his Office's performance and its duties.

173.    The Brooklyn District Attorney at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant City, and the Office was and is funded out of the City's budget.

174.    Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law § 2, and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Kings County), and hence Defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his employees and agents.

175.    At all relevant times, Mr. Hynes, personally and/or through his authorized delegates, had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

176.    By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Mr. Davis' constitutional rights and his resulting injuries.

## FOURTH CAUSE OF ACTION

### Malicious Prosecution (Under New York State Law)

*Against All Defendants*

177.    Mr. Davis repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

178.    The individual defendants, acting in concert with one another and/or

others, continued and caused the continuation of criminal proceedings against Mr. Davis

at a time when there was no probable cause for continuation of the criminal proceedings.

179.   By February 6, 1991 (the day Ms. Hayes testified) at the latest, probable

cause for the continuation of criminal proceedings against Mr. Davis did not exist.  The

individual defendants, who knew Ms. Hayes had been fed a false narrative and was

testifying falsely about who she was, how she came to testify, and what she had observed,

knew that there was no probable cause for Mr. Davis' continued prosecution.

180.   The criminal proceedings terminated in Mr. Davis' favor.

181.   The individual defendants acted for improper purposes and with actual

malice.

182.   Defendant City of New York is liable under the doctrine of *respondeat*

*superior*.

## FIFTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress (Under New York State Law)**

*Against All Defendants*

183.   Mr. Davis repeats and realleges the foregoing paragraphs and incorporates

them by reference as if fully set forth herein.

184.   The individual defendants engaged in a continuing pattern of extreme and

outrageous conduct directed at Mr. Davis from at least February 6, 1991, through the

expiration of his sentence and release from custody and post-release supervision.

185.   The individual defendants engaged in that pattern of conduct with the

intent of causing, or with reckless disregard for the substantial probability that it would

cause, severe emotional distress to Mr. Davis.

186.    The individual defendants' actions proximately caused severe emotional distress to Mr. Davis.

187.    Defendant City of New York is liable under the doctrine of *respondeat superior*.

## SIXTH CAUSE OF ACTION

**Negligent Training, Supervision, and Discipline (Under New York State Law)**

*Against Defendant City of New York*

188.    Mr. Davis repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

189.    The City of New York, intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline agents and employees of the Brooklyn District Attorney's Office with regard to the matters described above.

190.    The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Davis' wrongful conviction and resulting damages.

WHEREFORE, Plaintiff Carlos Davis demands judgment against the above-captioned Defendants as follows:

a.    For compensatory damages in an amount to be determined at trial, but not less than 20 million dollars;

b.    For punitive damages against the individual defendants in an amount to be determined at trial, but not less than ten million dollars;

c.    For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. §1988 and other applicable laws;

d.    For pre- and post-judgment interest as allowed by law; and

   e.  For such other relief as this Court deems just and proper.


Dated: July 1, 2016
   New York, New York

        DAVID B. SHANIES LAW OFFICE


     By: _____

        David B. Shanies
        411 Lafayette Street, 6th Floor
        New York, New York 10003
        (212) 951-1710
        david@shanieslaw.com

        LAW OFFICE OF RONALD L. KUBY
        Ronald L. Kuby
        119 West 23rd Street, 9th Floor
        New York, New York 10011
        (212) 529-0223
        info@kubylaw.com

        *Attorneys for Plaintiff Carlos Davis*

# EXHIBIT A

*People v. Murphy,* 109 A.D. 2d 895 (2d Dep't 1985) (prosecutor failed to timely disclose *Brady* material)

*People v. Perez,* 65 N.Y. 2d 154 (1985) (prosecutor committed *Rosario* violation by failing to disclose documentation indicating key witness accepted  bribe);

*People v. Gairy,* 116 A.D. 2d 733 (2d Dep't 1986) (prosecutor failed to timely disclose *Brady* material);

*People v. Ranghelle,* 69 N.Y. 2d 56 (1988) (prosecutor failed to obtain and disclose *Rosario* material);

*People v. Lugo,* 153 A.D. 2d 761 (2d Dep't 1989) (prosecutor's suppression of *Rosario* material required reversal of conviction);

*People v. Cortez,* 149 Misc. 2d 886 (Sup. Ct., Kings Co. 1990) (prosecutors and police violated *Brady* and court order by intentionally destroying tape containing impeachment material);

*People v. Nedrick,* 166 A.D. 2d 725 (2d Dep't 1990) (prosecutor failed to disclose tape-recorded impeachment material);

*People v. Anderson,* 160 A.D. 2d 806 (2d Dep't 1990) (prosecutor failed to timely disclose impeachment  material);

*People v. Brazzeal*, 172 A.D. 2d 757 (2d Dep't 1991) (prosecutor gave an improper and prejudicial summation);

*People v. Faison,* 176 A.D. 2d 752 (2d Dep't 1991) (prosecutor failed to timely disclose witness' prior statement);

*People v. Crespo,* 188 A.D. 2d 483 (2d Dep't 1992) (mistrial granted due to prosecutor's *Brady* violation);

*People v. Brown,* 187 A.D. 2d 437 (2d Dep't 1992) (trial court sanctioned prosecutor for *Brady* violation);

*People v. Young,* 155 Misc. 2d 878 (Sup. Ct. Kings Co. 1992), *on remand.from,* 79 N.Y. 2d 365 (1992) (failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony);

*Walker v. City of New York,* 974 F. 2d 293 (2d Cir. 1992) (Second Circuit upheld *Monell* claim against City of New York for unlawful policies of Brooklyn District Attorney's Office that allegedly resulted in withholding of *Brady* material causing plaintiff s wrongful conviction and 18-year imprisonment;

*People v. Donald Giddings,* 2/21/92 NYLJ 25 (col. l) (Sup. Ct., Kings Co. Feb. 21, 1992) (prosecutor's failure to disclose witness' prior inconsistent statements required conviction to be vacated);

*People v. Cecora,* 186 A.D. 2d 215 (2d Dep't 1992) (prosecution and police failed to disclose interview notes containing potential impeachment information);

*People v. Hughes,* 181 A.D. 2d 132 (2d Dep't 1992) (hearing required regarding prosecution's failure to disclose exculpatory police report);

*People v. Inswood,* 180 A.D. 2d 649 (2d Dep't 1992) (prosecution's failure to turn over *Brady* material was error);

*People v. Jackson,* 198 A.D. 2d 301 (2d Dep't 1993), *affirming* 154 Misc. 2d 718 (Sup. Ct., Kings Co. 1992) (prosecutors failed to timely disclose exculpatory statements; conviction reversed);

*People v. Stevens,* 199 A.D. 2d 441 (2d Dep't 1993) (*Rosario* material "improperly" withheld as well as *Brady* material; prejudice not sufficient to require reversal);

*People v. Khadaidi,* 201 A.D. 2d 585 (2d Dep't 1994) (conviction reversed for prosecution's failure to disclose interview notes with complainant containing prior inconsistent statement);

*People v. Alvarado,* 201 A.D. 2d 486 (2d Dep't 1994) (prosecution failed to disclose police reports containing impeachment material; conviction reversed);

*People v. Barnes,* 200 A.D. 2d 751 (2d Dep't 1994) (prosecutor did not record and did not disclose eyewitness' recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross-examined);

*People v. Bramble,* 207 A.D. 2d 407 (2d Dep't 1994) (sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request);

*People v. Roberts,* 203 A.D. 2d 600 (2d Dep't 1994) (prosecution delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed);

*People v. Neptune,* 161 Misc. 2d 781 (Sup. Ct. Kings Co. 1994) (prosecution acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the District Attorney's office);

*People v. Scott,* 216 A.D. 2d 592 (2d Dep't 1995) (prosecutor suppressed reports, including polygraph results indicating key witness was withholding information);

*People v. Ramos,* 166 Misc. 2d 515 (Sup. Ct. Kings Co. 1995) (due to District Attorney's Office policy of not taking notes of witness interviews, trial prosecutor was not aware of information acquired by previously assigned prosecutors for which court had ordered disclosure; conviction vacated on due process grounds);

*People v. Rahman,* 231 A.D. 2d 745 (2d Dep't 1996) (matter remitted for hearing concerning prosecution's apparent improper withholding of witness' cooperation agreement);

*People v. Perkins,* 227 A.D. 2d 572 (2d Dep't 1996) (prosecutor failed to disclose cooperation agreement with witness);

*People v. Scott,* 88 N.Y. 2d 888 (1996) (prosecution failed to disclose statement regarding polygraph result);

*People v. Callendar,* 227 A.D. 2d 499 (2d Dep't 1996) (conviction reversed due to prosecutor's failure to turn over notes of detective's prior statement);

*People v. Bruce,* 224 A.D. 2d 438 (2d Dep't 1996) (conviction reversed for prosecutor's failure to produce police reports containing impeachment material);

*People v. Dupont,* Kings County Ind. No. 6287/97 (Feldman, J.) (prosecutor made misrepresentation by claiming District Attorney's Office did not possess physical evidence specifically requested by the defense);

*People v. LaSalle,* 243 A.D. 2d 490 (2d Dep't 1997) (conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation);

*People v. Gourgue,* 239 A.D. 2d 357 (2d Dep't 1997) (prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed);

*People v. Hill,* 244 A.D. 2d 572 (2d Dep't 1997) (prosecutor sanctioned for failing to disclose 911 tape);

*People v. Gramby,* 251 A.D. 3d 346 (2d Dep't 1998) (prosecutor suppressed and failed to timely disclose 911 tape);

*People v. Green,* 10/19/99 N.Y.L.J. p. 30, col. 1 (Sup. Ct., Kings Co., Oct. 19, 1999) (prosecution failed to disclose *Brady* material);

*People v. Bond,* 95 N.Y. 2d 840 (2000) (myriad *Brady* violations established at Criminal Procedure Law Section 440.10 hearing, including failure to disclose material witness

proceeding concerning principal witness; conviction reversed due to prosecution's failure to disclose prior unrecorded statements to police by prosecution's main witness that she did not see the shooting about which she testified as an "eyewitness");

*People v. Davis,* 709 N.Y.S. 2d 345 (Sup. Ct. Kings Co. 2000) (prosecution violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed);

*People v. Campbell,* 269 A.D. 2d 460 (2d Dep't 2000) (prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction);

*People v. Calabria,* 94 N.Y. 2d 519 (2000) (prosecutor repeatedly defied court's ruling and made false or misleading argument to jury);

*People v. Campos,* 281 A.D. 2d 638 (2d Dep't 2001) (prosecutor failed to timely disclose *Brady* material; prejudice not sufficient to require reversal);

*Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001) (conviction overturned on habeas review due to prosecution's suppression of *Brady* material; prosecutor also misled defense counsel regarding a crucial witness);

*People v. Maddery,* 282 A.D. 2d 761 (2d Dep'' 2001) (prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction);

*Boyette v. LeFevre,* 246 F.3d 78 (2d Cir. 2001) (conviction vacated on habeas review because prosecutors suppressed *Brady* material);

*People v. Cannon,* 191 Misc. 2d 136 (Sup. Ct. Kings Co. 2002) (prosecution accountable for failure to preserve surveillance photographs);

*People v. King,* 298 A.D. 2d 530 (2d Dep't 2002) (prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed);

*People v. Jenkins,* 98 N.Y. 2d 280, 287-88 (2002) (Kaye, C.J., dissenting) (prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable);

*People v. Vielman,* 31 A.D. 3d 674 (2d Dep't 2006) (reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury");

*People v. Jones,* 31 A.D. 3d 666 (2d Dep't 2006) (prosecution fails to correct the false testimony of a key witness);

*People v. Thompson,* 54 A.D. 3d 975 (2d Dep't 2008) (prosecutor suppressed *Brady* material indicating someone other than the defendant committed the crime);

*Waston v. Greene,* 2009 WL 5172874 (E.D.N.Y. 2009) (prosecutors disclosed *Brady* material "too late" for the defense to make use of it even though they were aware of material "more than a year in advance of trial");

*People v. Malik,* 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) (prosecution's suppression of police report and other documents required vacatur of conviction);

*People v. Fuentes,* 12 N.Y. 3d 259 (2010) (prosecutor improperly withheld portion of medical records containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate").